IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Ronald J. Martin, | ) | C/A No.: 1:12-3656-DCN-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB").[1] The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

---

[1] Although Plaintiff concurrently applied for Supplemental Security Income, his income disqualified him from pursuing that application. *See* Tr. at 728. Accordingly, this appeal concerns only Plaintiff's DIB application.

I.      Relevant Background

A.      Procedural History

On August 27, 2003, Plaintiff filed an application for DIB in which he alleged his disability began on November 15, 1998.  Tr. at 15,[2] 129–31.  His application was denied initially and upon reconsideration.  Tr. at 67–68, 76–77.  On February 14, 2006, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Debra Morriss.  Tr. at 36.  At the hearing, Plaintiff amended his alleged onset date to January 14, 2004.  *Id.*  The ALJ issued an unfavorable decision on November 14, 2006, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 36–50.  Subsequently, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's decision and remanded the matter to an ALJ.  Tr. at 31–32.

ALJ Richard L. Vogel held a hearing on March 13, 2009, and issued an unfavorable decision on November 20, 2009.  Tr. at 15–26, 699–724.  On September 14, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision for judicial review purposes.  Tr. at 5–8.  Plaintiff appealed the decision to this court and, on December 7, 2011, the Honorable Joseph F. Anderson, Jr. reversed and remanded the decision for further administrative action.  *Martin v. Astrue*, C/A No. 1:10-2984-JFA-SVH, 2011 WL 6115032 (D.S.C. Dec. 7, 2011).  The Appeals Council remanded the case to the ALJ on March 30, 2012.  Tr. at 752–54.

---

[2] Although Plaintiff's application forms are dated September 20, 2003, they indicate August 27, 2003, the date of Plaintiff's original request, would be used as the filing date.  Tr. at 123.

ALJ Vogel held another hearing on August 17, 2012. Tr. at 767–90. The ALJ issued another unfavorable decision on September 6, 2012. Tr. at 728–41. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 31, 2012. [Entry #1].

B.      Plaintiff's Background and Medical History

        1.      Background

Plaintiff was born August 1, 1964, and was 39 years old as of his amended onset date. Tr. at 129, 702. He earned a graduate equivalency diploma and has past relevant work ("PRW") as a laborer and painter. Tr. at 24, 185, 702, 771. He alleges he has been unable to work since January 14, 2004. Tr. at 36.

        2.      Medical History

                a.      Prior to Onset Date

Plaintiff saw David Castellone, M.D., on February 16, 1999, with complaints of back pain. Dr. Castellone noted Plaintiff's back pain had improved, but that yard work made the pain return. Tr. at 517. Dr. Castellone noted the pain was not radicular and found that physical therapy ("PT") and x-rays were indicated. *Id.* A February 16, 1999, x-ray of Plaintiff's lumbar spine indicated disc space narrowing at L5–S1 and no compression fracture. Tr. at 544.

On March 24, 1999, Plaintiff saw Dr. Castellone with complaints of back pain that included radicular symptoms. Tr. at 515. Dr. Castellone diagnosed chronic lower back pain and degenerative disc disease ("DDD"), noted Plaintiff needed a spinal surgery option, and referred him to orthopedist William Wilson, M.D. *Id.*

3

Plaintiff saw Dr. Wilson on April 8, 1999, for evaluation of low back and left leg pain.  Tr. at 373.  Dr. Wilson diagnosed Plaintiff with back pain, intermittent left leg pain, and DDD at L5–S1, and noted that he wanted to rule out disc herniation.  *Id.*  He recommended a lumbar spine MRI study, which was performed on April 9, 1999.  *Id.*, Tr. at 199–200. The MRI indicated Plaintiff had a shallow right-sided disc herniation at T8–9, central disc herniation with bilateral root entrapment at L4–5, and central disc herniation contacting both sacroiliac nerve roots at L5–S1.  Tr. at 199–200.

On April 27, 1999, Dr. Wilson administered an epidural steroid injection into Plaintiff's spine at L4–5.  Tr. at 523.

A myelogram of Plaintiff's lumbar spine on May 18, 1999, demonstrated disc space narrowing at L4–5.  Tr. at 495.  A May 18, 1999, CT scan of Plaintiff's lumbar spine showed spinal stenosis at L4–5, predominantly secondary to disc bulge with associated facet arthropathy, ligamentum flavum, and hypertrophy.  Tr. at 531.

On June 15, 1999, Dr. Wilson performed L4–5 bilateral hemilaminotomy, foraminotomy, and discectomy and left sided L5–S1 hemilaminotomy and discectomy surgery on Plaintiff.  Tr. 490–92.  On June 24, 1999, Plaintiff saw Dr. Wilson for a post-operative examination.  Tr. at 369.  Plaintiff was walking with a cane, complained of back discomfort and numbness in right leg.  *Id.*  Dr. Wilson examined Plaintiff, noting pain in back and leg with straight leg raising and with strength testing.  *Id.*  Dr. Wilson noted Plaintiff's work restrictions as "out of work," and noted Plaintiff had not achieved maximum medical improvement ("MMI").  Tr. at 369.

On July 21, 1999, Plaintiff told Dr. Wilson he was doing better overall since his surgery, but that he had noticed increased back pain over the prior several days.  Tr. at 368.  Dr. Wilson examined Plaintiff and noted he continued to have radicular symptoms and hypesthesia throughout his back.  *Id.*  The doctor again noted Plaintiff remained out of work and had not achieved MMI.  *Id.*

PT notes dated August 10, 1999, indicate Plaintiff complained of increased low back pain, that he had an antalgic gait, and that he required a cane to walk.  Tr. at 223.  Notes indicate Plaintiff had been to PT six times since July 23, 1999.  *Id.*

On August 11, 2009, Dr. Wilson indicated Plaintiff's work restrictions as "cannot perform regular job."  Tr. at 367.  He also found Plaintiff had not achieved MMI.  *Id.*

A September 8, 1999, x-ray of Plaintiff's lumbar spine showed no acute abnormalities, with slight narrowing of the L4–5 and L5–S1 intervertebral disc spaces, most likely degenerative in origin.  Tr. at 483.

An MRI of Plaintiff's lumbar spine on September 20, 1999, showed no interval change when compared to the previous study, discectomies at L4–5 and L5–S1 with formulation of granulation tissue, and no recurrent disc herniation.  Tr. at 197–98.

Notes from Plaintiff's PT session on October 27, 1999, indicate he had not achieved his goals, was at a plateau, and only obtained temporary relief from aquatic therapy.  Tr. at 222.  Plaintiff's therapist recommended he discontinue therapy.  Tr. at 223.  On October 28, 1999, Dr. Wilson diagnosed Plaintiff with postlaminectomy back pain with underlying degenerative changes at L4–5 and L5–S1.  He restricted Plaintiff to no lifting, bending, or twisting and said Plaintiff had not reached MMI.  Tr. at 365.

On January 18, 2000, Dr. Wilson performed anterior discectomy, anterior lumbar interbody fusion, femoral ring allograft implantation, and graft-on surgery on Plaintiff's spine at L4–5 and L5–S1. Tr. at 201–02, 206–08, 479. He had no surgical complications and was released to recovery in stable condition. Tr. at 206, 208. Dr. Wilson's notes indicate Plaintiff had experienced some improvement in his leg pain from the prior laminectomy, but that he continued to have "persistent severe incapacitating low back pain" that had not responded to prior treatment. Tr. at 201.

On May 10, 2000, Plaintiff saw Dr. Wilson, who indicated Plaintiff's ambulation was a little more steady. Tr. at 360. Dr. Wilson assigned work restrictions to Plaintiff, including no bending or twisting and lifting of no more than ten pounds. *Id.*

An MRI study of Plaintiff's spine on June 30, 2000, showed post-operative changes from interbody fusion at L4–5 and L5–S1. Tr. at 472–74. It showed soft tissue prominence in the right neural foramen, possibly representing a small disc herniation contacting the L4 nerve root, and subtle enhancement at the post-operative level, likely due to scar and granulation tissue. Tr. at 473. On November 14, 2000, Plaintiff had a ventral incisional hernia surgically repaired. Tr. at 463–66.

Plaintiff saw Todd Joye, M.D., on February 2, 2001. Tr. at 338–39. Dr. Joye diagnosed low back pain with multiple etiologies, including failed back surgery syndrome with scar tissue, possible radiculopathy facet disease and/or sacroiliac pain as well as myofascial pain, and postoperative abdominal pain. *Id.* He recommended facet or sacroiliac joint injections and prescribed medications. *Id.* Plaintiff again saw Dr. Joye on February 21, 2001, to discuss pain treatment options. Tr. at 334–35. Dr. Joye

6

prescribed Remeron, began oxycodone for break-through pain, continued Plaintiff on Neurontin, and scheduled visits for injections.  Tr. at 335.

In a February 2001 examination, Dr. Wilson found Plaintiff had a somewhat limited range of motion in his back and that straight leg raising tests produced back pain, particularly on the left side, as well as some leg pain.  Tr. at 356.  Dr. Wilson recommended Plaintiff undergo pool therapy and facet block injections and found he could perform sedentary work.  *Id.*

Dr. Joye administered bilateral facet interarticular injections to Plaintiff in March 2001 and epidural steroid injections in April and May 2001.  Tr. at 420–23, 330–31.

In March 2001, an MRI of Plaintiff's lumbar spine showed evidence of a prior fusion at L4–5 and L5–S1 with minimal posterior disc bulge and spurring at the L5–S1 level without evidence of central canal stenosis or neural foraminal narrowing.  Tr. at 460–61, 502–03.

On June 7, 2001, Plaintiff saw Donald Stovall, M.D., with complaints of low back and left leg pain.  Tr. at 210–12.  Dr. Stovall indicated Plaintiff's medical history reflected a 1998 work injury that hurt his back, after which he underwent two back surgeries.  Tr. at 210.  Plaintiff told Dr. Stovall that he still had abdominal pain and had developed further lower back pain.  *Id.*  He also complained of left hip pain with numbness, and indicated that standing, walking, sitting, or driving for more than half an hour aggravated his pain.  *Id.*  On examination, Dr. Stovall found Plaintiff moved slowly with an antalgic gait, had some diffuse tenderness and very limited range of motion of the back, a stable pelvis to anterior and lateral compression.  *Id.*  He had a decreased range of

motion and diffuse weakness in his lower left extremity and could not straighten his left leg.  Tr. at 211.  His right lower extremity was normal, and he had decreased sensation over the lateral aspect of his left leg and foot and a mildly positive straight leg raising test on the left.  *Id.*  Dr. Stovall diagnosed L4–5, 5–1 lumbar discectomy and anterior interbody fusion without evidence of collapse or loosening, and he felt Plaintiff would benefit from chronic pain management with PT, aerobic conditioning, smoking cessation, and pain control with limited medications.  Tr. at 211–12.  Dr. Stovall found that Plaintiff was a candidate for vocational rehabilitation and opined that he could be "placed into a light work capacity," with limitations of alternate sitting and standing, occasional lifting of up to 25 pounds, and frequent lifting of up to 15 pounds.  Tr. at 212.

On July 3, 2001, Dr. Wilson stated Plaintiff could perform work with intermittent sitting/standing, occasional lifting of up to 25 pounds, frequent lifting of up to 15 pounds, and light work duties.  Tr. at 354.  He indicated vocational rehabilitation would be helpful for Plaintiff, found Plaintiff had achieved MMI, assigned Plaintiff a 15 percent whole person impairment due to his lumbar spine, and discharged him from care.  Tr. at 354.

In November 2001, Dr. Castellone diagnosed Plaintiff with worsening anxiety, stable low back syndrome, and improving vasovagal reaction and prescribed medications.  Tr. at 619–22.  That same month, Plaintiff went to Charleston Psychiatry and was prescribed antidepressant and anxiolytic medications.  Tr. at 384–85.

On December 10, 2001, HealthSouth physical therapist Jill Durand examined Plaintiff and evaluated his functional capacity.  Tr. at 233–36.  Ms. Durand observed Plaintiff walk with a cane for 30 minutes, and found Plaintiff showed positive Waddell's

signs.  Tr. at 234.  She observed him ambulate on his toes independently and on his heels inconsistently, and stated he could ambulate with and without a cane.  *Id.*  Ms. Durand found Plaintiff had positive straight leg raising tests, a reduced range of motion upon evaluation of his lumbar spine, and more range of motion during other observed activities, strength testing, bending, and lifting.  *Id.*  Ms. Durand found Plaintiff had full lower extremity strength and found that he could perform at the "[l]ight physical demand level, placement per physicians' discretion."  Tr. at 233–34.

Dr. Joye administered pain-management treatments such as intercostal block injections and epidural steroid injections to Plaintiff regularly from December 2001 through March 2003.  Tr. at 313–15, 391–92, 403, 407, 410–12, 418.

Plaintiff returned to Charleston Psychiatry for follow up in 2002 and continued to received treatment with medication.  *See* Tr. at 378–83 (visits from February through December 2002).

On December 20, 2002, Plaintiff returned to Dr. Wilson complaining of continued low back pain and intermittent left leg pain.  Tr. at 351.  Dr. Wilson examined Plaintiff, observed he walked with a cane, had an antalgic gait, and wore a back brace.  *Id.*  Dr. Wilson found Plaintiff's motor exam in his lower extremities was intact and continued Plaintiff's work restrictions from July 2001.  *Id.*  Dr. Wilson opined that Plaintiff had reached MMI and assigned a 25 percent whole-person impairment rating.  *Id.*

On October 22, 2002, Dr. Charles Jervey of Carolina Neurological Clinic evaluated Plaintiff, noting some paraspinous tenderness and percussion tenderness down Plaintiff's midline thoracic to lower lumbosacral region, diminished pinprick sensation,

and limited flexibility on the left.  Tr. at 304.  Dr. Jervey suggested Plaintiff try to manage pain through using Desyrel and exercise.  *Id.*

Plaintiff continued to receive medication treatment from Charleston Psychiatry in 2003.  *See* Tr. at 375–77 (visits from January through June 2003).

On December 11, 2003, Harriet Steinert, M.D., examined Plaintiff at the request of the Commissioner.  Tr. at 424–45.  Dr. Steinert noted Plaintiff had not worked since injuring his back at work in 1998.  Tr. at 424.  Plaintiff reported to Dr. Steinert that he had also hurt his neck, but that no one ever checked it.  *Id.*  He complained of migraine headaches, pain in his right arm and hand with carpal tunnel syndrome, and pain in his lower back and legs.  *Id.*  He said he could not lift anything heavy, had to walk with a cane, and could not bend, stoop, or squat.  *Id.*  Dr. Steinert found Plaintiff had full range of motion in his neck and in all of the joints of his four extremities.  *Id.*  She found Plaintiff had no sensory or motor deficits in any of his extremities; had normal fine motor skills, grip strength, and reflexes; and had some difficulty moving from a sitting to a lying position and the reverse because of pain.  *Id.*  Plaintiff's straight leg raising tests were positive; he could flex at the lumbar area, but had tenderness to palpation.  Tr. at 424–25.  Dr. Steinert observed that Plaintiff could walk around the room slowly without the use of any assistive device, but was unable to walk on his toes or heels.  Tr. at 425.  Dr. Steinert diagnosed chronic lumbar spine pain with radiation into the legs, right carpal tunnel syndrome, migraines, chronic neck pain, and hypertension.  *Id.*

On December 30, 2003, state-agency consultant George Keller, M.D., reviewed the evidence and completed a physical residual functional capacity ("RFC") assessment

10

form, finding Plaintiff could perform light work that did not require climbing of ladders, ropes, or scaffolds or more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  Tr. at 670–77.

On January 9, 2004, Cashton Spivey, Ph.D., performed a psychological examination of Plaintiff at the request of the Commissioner.  Tr. at 426–29.  Plaintiff told Dr. Spivey he had previously participated in outpatient counseling secondary to pain issues and depression, but that he had never been hospitalized for psychiatric treatment.  Tr. at 427.  Plaintiff reported significant feelings of depression, secondary to his chronic pain, marital issues, and subsequent physical limitations.  *Id.*  Plaintiff told Dr. Spivey he had difficulty sleeping, had experienced a reduced appetite, low energy, attention/concentration problems, and infrequent crying.  *Id.*  Plaintiff reported that he bathed and dressed independently, cooked and drove infrequently, and that he could read the newspaper and perform simple arithmetic.  *Id.*  Dr. Spivey observed Plaintiff was appropriately dressed and groomed and noted he was cooperative and compliant throughout the evaluation.  *Id.*  Dr. Spivey found Plaintiff was oriented to place and person, essentially oriented to time, and did not know the date.  Tr. at 428.  He could not perform serial sevens, could spell the word "world" backwards, recalled two of three objects at five minutes, demonstrated intact language skills, could follow a three-step command, and accurately reproduced a drawing.  *Id.*  Dr. Spivey found that Plaintiff's insight and judgment appeared to be fair and that he appeared to be of average general

intelligence. *Id.* Dr. Spivey diagnosed major depressive episode and anxiety disorder and assigned a global assessment of functioning ("GAF") score of 40.[2] *Id.*

b.     After Onset Date

Plaintiff saw Dr. Castellone on January 15, 2004, with complaints of anxiety, hypertension, backache, and allergies. Tr. at 582–83. Dr. Castellone found Plaintiff had a decreased range of motion and pain in his lumbar spine, and that he was depressed and anxious. Tr. at 583. Dr. Castellone diagnosed uncontrolled depression, uncontrolled hypertension, uncontrolled DDD, and improved sinusitis. Tr. at 583. He prescribed Percolone, Prozac, and Ziac. Tr. at 582–83.

On February 18, 2004, a state-agency physician reviewed the record evidence and agreed with Dr. Keller's December 2003 findings regarding Plaintiff's RFC. Tr. at 682–83.

On March 15, 2004, Plaintiff saw Dr. Castellone for follow-up to his DDD, depression, hypertension, and sinusitis. Tr. at 580. Plaintiff said he had a severe, constant backache. *Id.* Dr. Castellone diagnosed gastroesophageal reflux disease ("GERD"), uncontrolled DDD, uncontrolled sinusitis, stable depression, and hypertension. Tr. at 581. He prescribed Astelin, Klonopin, Nexium, Paxil, and Percolone. *Id.*

---

[2] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999). A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work or school, family relations, judgement, thinking, or mood . . . ." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

On March 16, 2004, in response to an information request from the state agency, Dr. Castellone stated that Plaintiff was "unable to work in any occupation" because of "severe disabling DDD."  Tr. at 691.

On April 28, 2004, Plaintiff saw Dr. Castellone for hypertension and allergies, among other complaints.  Tr. at 577–78.  Plaintiff indicated his hypertension was severe, worsening, and aggravated by stress.  Tr. at 577.  On examination, Dr. Castellone found Plaintiff had no tenderness in his extremities and a normal gait.  Tr. at 578.  Dr. Castellone diagnosed uncontrolled hypertension and sinusitis.  *Id.*

On May 17, 2004, Dr. Castellone diagnosed Plaintiff with benign essential hypertension and improving hemorrhoids and pilonidal cyst.  Tr. at 576.

When Plaintiff saw Dr. Castellone on July 13, 2004, for other issues, Dr. Castellone noted Plaintiff had decreased range of motion and pain in the lumbar spine with paraspinal muscle spasms and that he was anxious.  Tr. at 573–74.  Dr. Castellone's diagnoses included stable depression and hypertension.  Tr. at 574.

On September 13, 2004, Dr. Castellone diagnosed Plaintiff with sinusitis and migraine headache and prescribed Fioricet and Septra.  Tr. at 572.  He administered a Nubain and Phenergan injection.  *Id.*

On September 29, 2004, Plaintiff presented to Dr. Castellone with complaints of a migraine headache and neck pain.  Tr. at 569.  Dr. Castellone diagnosed uncontrolled migraine headache and DDD, prescribed Fioricet and Lamictal, and administered a Nubain and Phenergan injection.  Tr. at 570.

13

On October 7, 2004, Plaintiff saw Dr. Castellone with complaints of dizziness, falling, migraine headaches, and weight loss. Tr. at 568. Dr. Castellone diagnosed worsening migraine headache and admitted Plaintiff to the hospital. *Id.*; Tr. at 445–46.

John Plyler, M.D., examined Plaintiff, noted an emergent CT of the brain was unrevealing, and observed that Plaintiff looked to be resting uncomfortably. Tr. at 448–47. Plaintiff complained of a stiff neck, and Dr. Plyler found he had some subtle decrease of cervical spine range of motion, some tenderness to palpation of the neck strap muscles, and no focal weakness. Tr. at 449. Dr. Plyler found Plaintiff had intact sensation, no cranial nerve deficits, and generally clear speech. *Id.* He diagnosed neck pain and headache, recommended CT angiogram and cervical spine MRI studies, and indicated he would prescribe Plaintiff steroids, muscle relaxers, and a trial of Topomax. *Id.*

On October 10, 2004, Dr. Castellone discharged Plaintiff from the hospital after diagnosing severe unrelenting headache secondary to fibromyalgia and myofascial pain syndrome, lumbar DDD, hypertension, dehydration with electrolyte abnormalities, and chronic depression. Tr. at 443–44. He prescribed Tenoretic, Effexor, Naprosyn, Percolone, Topamax, Zanaflex, and Fioricet. Tr. at 443.

On October 14, 2004, Plaintiff returned to Dr. Castellone with complaints of headache and back pain. Tr. at 566. Dr. Castellone found Plaintiff had negative straight leg raising tests and decreased ranges of motion, tenderness, and spasms in the cervical and lumbar spine. Tr. at 567. He assessed Plaintiff with medication side effects, stable

14

migraine headache, and DDD, and prescribed medications Effexor, Fioricet, Percolone, Tenoretic, Topamax, and Zanaflex. *Id.*

Plaintiff saw Dr. Castellone again on October 26, 2004, with complaints of anxiety and backache, and follow up for medication side effects and migraine headache. Tr. at 564. Dr. Castellone diagnosed stable depression, migraine headaches, and DDD and prescribed Effexor, Klonopin, Naprosyn, and Topamax. Tr. at 565.

On November 1, 2004, Dr. Castellone wrote a letter as Plaintiff's primary care physician, and stated that Plaintiff had DDD of the spine with chronic pain, severe migraine headaches, chronic depression, and hypertension. Tr. at 563. He opined that Plaintiff was unable to work for the foreseeable future and "should be considered 100% permanently and totally disabled." Tr. at 563.

On November 30, 2004, Plaintiff complained to Dr. Castellone of anxiety, migraine headache, and back pain. Tr. at 559. Dr. Castellone diagnosed improving depression, migraine headache, and DDD and prescribed Effexor. Tr. at 560.

On December 16, 2004, Plaintiff reported anxiety, depressive symptoms, and backache to Dr. Castellone. Tr. at 557. Dr. Castellone found that Plaintiff had decreased extremity range of motion and pain in his lumbar spine and that he was anxious and depressed. He diagnosed uncontrolled depression, migraine headache, and DDD and prescribed Effexor, Percolone, and Topamax. Tr. at 557–58.

On January 19, 2005, a state-agency medical consultant reviewed the evidence and assessed Plaintiff's physical RFC. Tr. at 634–41. The consultant found Plaintiff could perform light work that did not require climbing of ladders, ropes, or scaffolds or more

than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling.  Tr. at 634–41.

In a letter dated March 1, 2005, Dr. Castellone stated that he had cared for Plaintiff for a number of years as his Plaintiff's primary care physician, and that Plaintiff "continue[d] to suffer from debilitating chronic pain."  Tr. at 696.  Dr. Castellone indicated Plaintiff's pain was secondary to DDD, fibromyalgia, osteoarthritis, severe anxiety, depression, panic attacks, vasovagal syncope, and severe migraine headaches. *Id.*  Dr. Castellone noted Plaintiff took multiple medications and had difficulty with his activities of daily living ("ADLs").  *Id.*  He indicated "[t]here was no way he c[ould] hold down a job that would require him to do any combination of walking, standing or sitting or even just a completely sedentary job."  *Id.*  He said Plaintiff was "100% permanently and totally disabled."  *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing on March 13, 2009

a.    Plaintiff's Testimony

At the March 13, 2009 hearing, Plaintiff answered questions regarding his abilities as of January 2004, his amended alleged onset-of-disability date.  *See* Tr. at 706–07.  He stated that, in January 2004, he had sudden, sharp pains in his lower back and that the pain went down his legs and made them numb.  Tr. at 707–08.  He said that he could sit for only 15 minutes before needing to move around and that he could only stand without having to hold on to anything for about five minutes.  Tr. at 708–09.  Plaintiff testified he could not walk a full city block without stopping to rest, and that he used a cane since

2004.  Tr. at 709.  He said he could not walk at a normal pace and that he had difficulty with his balance and with walking on uneven surfaces.  *Id.*  He said that he could not lift more than five pounds, had difficulty bending and reaching overhead, could not stoop, and had to lie down three or four times every day for an hour to relieve his pain.  Tr. at 709–12.  Plaintiff stated that he soaked in hot water, used a heating pad, and took narcotic pain medications to relieve his pain.  Tr. at 712.  He testified that the narcotics caused memory loss, shaking, blurred vision, dizziness, and bladder problems.  Tr. at 713.  He said that he experienced muscle spasms in his lower back, left leg, and feet every day, and his pain caused him to awaken about three times per night.  Tr. at 713–14.  He testified that pain caused him trouble concentrating and made it difficult for him to be around others.  Tr. at 715.  When asked about his ADLs in 2004, Plaintiff testified that he did very little cooking and that he did dishes, but that it took him all day to finish them.  Tr. at 716–17.  He said he could not vacuum or perform outdoor chores.  Tr. at 17.  Plaintiff said he had difficulty dressing, bathing, and shaving, and that he was unable to get out of bed due to pain eight days per month.  Tr. at 717–18.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Feryal Jubran reviewed Plaintiff's medical records and heard his testimony.  Tr. at 721.  The VE testified that Plaintiff did not have any PRW that was unskilled and sedentary.  Tr. at 721.  The ALJ then asked the VE to assume a hypothetical worker with the same age, education, and work experience as Plaintiff who was limited to a sedentary exertional level with no climbing or crawling; no more than occasional crouching and stooping; no exposure to industrial hazards; a low stress setting

with no more than occasional decision making or changes in the work setting; and no exposure to the general public. Tr. at 721. The VE testified that such an individual could perform the jobs of machine tender, inspector, and surveillance system monitor. Tr. at 721–22. The VE testified that her testimony was consistent with the Dictionary of Occupational Titles ("*DOT*"), except that the official job descriptions in the *DOT* did not include an available low stress limitation. Tr. at 722. The VE explained that, vocationally speaking, she considered low stress work to be simple work without exposure to the public and no more than occasional decision making or changes in the work setting. *Id.* In response to a question from Plaintiff's counsel, the VE opined that a person with the additional limitation of being unable to concentrate for more than two-thirds of the work day could not perform the jobs she identified for the ALJ. Tr. at 723. The VE could identify no jobs that the hypothetical person identified by Plaintiff's counsel could perform. *Id.*

2.    The Administrative Hearing on August 17, 2012

a.    Plaintiff's Testimony

At the hearing on August 17, 2012, Plaintiff's testimony was substantially similar to his testimony on the prior hearing. Tr. at 773–80. He again described his medical impairments and the side effects of his medications. *Id.*

b.    Testimony of Plaintiff's Wife

Plaintiff's wife, Cleo Martin, testified that her husband was always in pain and very depressed in 2004. Tr. at 781. She said that his depression became so bad that they sent their 13-year-old daughter to live with her older sister and that their son moved back

home to help with home maintenance.  Tr. at 782.  She stated that she had to remind Plaintiff to bathe and eat and had to shave him because his hands shook so badly.  *Id.* She testified that in 2003 or 2004, Plaintiff was hospitalized after his medications caused his heart to stop.  Tr. at 783.

Mrs. Martin stated that Dr. Castelone managed all of her husband's medications and had been doing so since at least 2004 and that he wrote the prescriptions for Plaintiff's depression and migraine medications.  Tr. at 783–84.  She estimated that in 2004, Plaintiff had a migraine headache every week that caused him to be unable to see, read, or stand up.  Tr. at 785.  She said he also had problems with his memory and had difficulty keeping food down.  Tr. at 785–86.

c.    Vocational Expert Testimony

VE Carroll Hart Crawford reviewed the record and testified at the hearing.  Tr. at 787.  The VE categorized Plaintiff's PRW as medium or heavy.  Tr. at 78.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform sedentary work; never climb, crawl, or be exposed to industrial hazards; occasionally crouch and stoop; work in a low stress setting with no more than occasional decision making or changes in the setting; never be exposed to the general public; and not interact with co-workers for more than one-third of the workday.  Tr. at 787–88.  The VE testified that the hypothetical individual would be able to perform the jobs of addresser, document sorter, and weight tester.  Tr. at 788.  Upon questioning by Plaintiff's counsel, the VE stated that the hypothetical individual would be unable to perform those jobs if he was unable to focus, attend to task, and concentrate for up to 20 percent of the workday.  Tr.

at 789.  The VE also stated that employers will generally only tolerate two absences per

month.  Tr. at 789.

### 3.     The ALJ's Findings

In his decision dated September 6, 2012, the ALJ made the following findings of

fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security
      Act on December 31, 2004.
2.    The claimant did not engage in substantial gainful activity during the period
      from his amended alleged onset date of January 14, 2004 through his date
      last insured of December 31, 2004 (20 CFR 404.1571 *et seq.*).
3.    As of December 31, 2004, the claimant had the following severe
      impairments: lumbar degenerative disc disease, migraine headaches,
      hypertension, depression, and anxiety (20 CFR 404.1520(c)).
4.    Through the date last insured, the claimant did not have an impairment or
      combination of impairments that met or medically equaled the severity of
      one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1
      (20 CFR 404.1520(d), 404.1525 and 404.1526).
5.    After careful consideration of the entire record, the undersigned finds that,
      through the date last insured, the claimant had the residual functional
      capacity to perform sedentary work as defined in 20 CFR 404.1567(a).  The
      claimant was able to lift and carry no more than ten pounds at a time and
      occasionally lift and carry articles such as docket files, ledgers, and small
      tools.  The claimant was able to sit for six hours in an eight hour workday
      and stand and/or walk for two hours in an eight hour workday.  He was
      unable to perform climbing or crawling and no more than occasional
      crouching and stooping.  He was unable to work in exposure to industrial
      hazards.  He was limited to working in a low stress setting with no more
      than occasional decision making or changes in the work setting, and with
      no interaction with the general public, and only occasional interaction with
      co-workers and supervisors.
6.    Through the date last insured, the claimant was unable to perform any past
      relevant work (20 CFR 404.1565).
7.    The claimant was born on August 1, 1964 and was 39 years old, which is
      defined as a younger individual age 18–44, on the date last insured (20 CFR
      404.1563).
8.    The claimant has at least a high school education and is able to
      communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, from January 14, 2004, the amended alleged onset date, through December 31, 2004, the date last insured (20 CFR 404.1520(g)).

Tr. at 730–41.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ failed to properly consider Plaintiff's combined impairments; and

2)  the ALJ erred in his step four analysis.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.  Legal Framework

1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520.  These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[3]  The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii).  To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4]  In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Combination of Impairments

On remand, the ALJ was directed to consider the combined effect of Plaintiff's impairments. *Martin*, 2011 WL 6115032, at *1. Plaintiff argues that the ALJ again failed to satisfactorily conduct this analysis. [Entry #15 at 14–16]. The Commissioner

responds that the ALJ properly analyzed Plaintiff's combined impairments and fulfilled the directions in the remand order.  [Entry #17 at 8–10].

When, as here, a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status.  *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments).  The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B) (2004).  The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them."  *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments."  *Id.*

On remand, the ALJ added the following paragraph to his Listing analysis:

Moreover, the undersigned has considered the combined effects of the claimant's impairments, and has determined that the findings related to them were not at least equal in severity to those described in the listings set forth above prior to the expiration of his insured status.  See also Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989).  Specifically, the undersigned notes that the claimant's combination of impairments, especially his musculoskeletal impairments, hypertension, migraine headaches, and mental impairments has not resulted in the equivalent of Listings 1.04, 4.03, 11.03, 12.04 or 12.06, as the claimant's activities of daily living included watching television, walking around the yard, doing some cooking and some cleaning, and washing dishes.  Treating physician, Dr. Castellone

has reported that his hypertension and migraine headaches were stable during the relevant period. While the claimant's impairments cause some limitations, there is no evidence that he is more limited than indicated by the residual functional capacity set forth below.

Tr. at 733.

Plaintiff acknowledges the ALJ's addition of the above-quoted paragraph, but argues that it only addresses the question of equivalence as to the specified Listings and does not satisfy the ALJ's duty under *Walker*. [Entry #15 at 14]. He argues that the ALJ should have considered whether Plaintiff's combined impairments were of Listing-level severity, not whether they met or equaled the requirements of a specific Listing. [Entry #18 at 2–3].

As support for his argument, Plaintiff states that 20 C.F.R. § 404.1526 "clearly contemplates a situation in which the findings related to disparate impairments are considered together to rise to Listing-level severity without reference to a specific Listing." [Entry #15 at 15]. A plain reading of the regulation belies Plaintiff's argument. Pursuant to 20 C.F.R. § 404.1526(c), where a claimant has a combination of impairments, but none meets a Listing, the ALJ will compare the claimant's findings with those for closely analogous listed impairments. If the findings related to the claimant's impairments are at least of equal medical significance to those of a listed impairment, the ALJ will find that the claimant's combination of impairments is medically equivalent to that listing. 20 C.F.R. § 404.1526(c). Thus, the regulation provides that the ALJ should consider a claimant's combined impairments in the context of specific Listings.

Plaintiff's argument, though novel and nuanced, is not supported by the great weight of authority in this District[5] and draws a distinction that does not appear to have been contemplated by the regulations and case law.  Although Plaintiff contends the ALJ should have considered whether Plaintiff's combined impairments were of Listing-level severity generally, he fails to identify the measure to be used for such an analysis when it is conducted independently of the Listings set forth in the regulations.  Finally, this District has found that Fourth Circuit precedent issued after *Walker* suggested that *Walker* was not meant to be used as a trap for the Commissioner.  *See Brown v. Astrue*, C/A No. 0:10-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012).

Because the ALJ provided a discussion of Plaintiff's combined impairments at step three that identified the impairments at issue and found their combined effect was not equivalent to the relevant Listings, the undersigned recommends finding that the ALJ's step three analysis is supported by substantial evidence and is sufficient under *Walker*.

2.    Step Four Analysis

Plaintiff also argues that the ALJ erred at step four because he failed to adequately assess Plaintiff's credibility and RFC.  [Entry #15 at 16–20].  The Commissioner contends that the ALJ's step four analysis is legally proper.  [Entry #17 at 15–24].

---

[5] *See* the unpublished opinions appended to and cited in the Commissioner's brief. [Entry #17 at 13–14].

a.    Credibility Determination

Plaintiff asserts that the ALJ failed to conduct a sufficient credibility assessment on remand as the court directed him to do.  [Entry #15 at 16].  Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged.  *See* 20 C.F.R. § 404.1529; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain).  The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain."   76 F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work."  *Id.* at 595.  This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about his pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989).  "The determination or decision must contain specific

reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms he alleged, but determined that Plaintiff's statements "concerning the intensity, persistence and limiting effects" of his symptoms were "not credible to the extent" they were inconsistent with the ALJ's determination of his RFC. Tr. at 737.

In discounting Plaintiff's credibility, the ALJ stated that Plaintiff and others had described ADLs that were not inconsistent with the assessed RFC, including light cooking, driving, walking outside often, watching television, frequently socializing with friends for dinners and picnics, cleaning, going to the grocery store, and occasionally fishing. *Id.* The ALJ noted that medical evidence often indicated that Plaintiff was in no distress, and that a record dated May 11, 2004, provided that Plaintiff was in no distress and was well developed, well nourished, and had a full range of motion in his extremities. *Id.* The ALJ stated that although Plaintiff testified in 2006 that he had "drop foot" since his first surgery, the medical records do not support his assertion. *Id.* Rather, the records document a normal gait in December 2003 and April 2004. Tr. at 737–38. The ALJ noted that Plaintiff's testimony regarding having migraines four times per week was contradicted by a new diagnosis of migraine headaches in September 2004 and, shortly thereafter, a record indicating that the condition was stable and improving. Tr. at 738. Finally, the ALJ stated that the treatment notes did not support Plaintiff's alleged medication side effects of memory loss, shakiness, blurry vision, dizziness, bladder problems, anger, and concentration problems. *Id.* The ALJ noted that sedation was the only side effect documented in the treatment notes. *Id.*

Plaintiff contends the ALJ's credibility assessment is defective because (1) he failed to properly cite to the record for much of his discussion, (2) he relied on a strained reading of the evidence, and (3) he failed to connect the supposed inconsistencies in Plaintiff's testimony to any specific allegations of functional limitation. [Entry #15 at 19–20].

Plaintiff's arguments are unavailing. He cites to no authority requiring an ALJ to provide record citations in his decision. Furthermore, the ALJ sufficiently described the records he relied upon to permit the undersigned to locate them in the record. Thus, the decision provides sufficient information to enable the court to determine whether the ALJ's findings are supported by substantial evidence.

With regard to the ALJ's alleged strained reading of the record, Plaintiff contends that the ALJ selectively cited to a report of contact in which Plaintiff reported going fishing. [Entry #15 at 19]. Plaintiff notes that the document provides that he only went fishing for 30 minutes at a time. *Id.* (citing Tr. at 151). While Plaintiff may have fished for only short periods at a time, the record reflects his admission that he did go fishing, and the undersigned does not find that the ALJ erred in noting fishing as part of Plaintiff's ADLs. Plaintiff also notes that contrary to the ALJ's holding, Plaintiff's alleged impairment of "drop foot" is supported by a record indicating that Plaintiff was fitted for a shoe lift because he lost height in his left leg. *Id.* The record Plaintiff cites is a disability report completed by him and listing Floyd Brace Company as a medical provider that measured him for a shoe lift. Tr. at 189. It is unclear whether the Commissioner ever obtained the records from Floyd Brace Company. That is irrelevant, however, because even assuming Plaintiff was measured for a shoe lift, the record still does not contain a diagnosis of drop foot. Furthermore, the contradiction between Plaintiff's testimony regarding the condition and the lack of medical evidence was only one of several reasons cited by the ALJ in support of his credibility determination. Thus, even if the ALJ erred in stating the record did not support the alleged impairment, the

undersigned finds the error to be harmless. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

Finally, Plaintiff asserts that the ALJ failed to connect the supposed inconsistencies in his testimony to any specific allegations of functional limitation. [Entry #15 at 20]. In the prior order remanding this matter, the court noted that the ALJ failed to explain how the ADLs he cited in his decision were not consistent with Plaintiff's alleged RFC. *See Martin*, 2011 WL 6115032, at *2. This appears to be the basis for Plaintiff's argument. However, the court also noted that the ALJ failed to discuss any other factors in SSR 96-7p and did not sufficiently analyze and discuss the evidence on which he relied in discounting Plaintiff's pain complaints. *Id.* In the decision presently before the court, the ALJ did not rely solely on Plaintiff's ADLs in discounting his credibility. Rather, he provided additional reasons consistent with SSR 96-7p for his credibility finding. For these reasons, the undersigned finds that any error by the ALJ in failing to articulate how Plaintiff's ADLs are inconsistent with his alleged functional limitations was harmless.

Because the ALJ identified several reasons for discounting Plaintiff's credibility and Plaintiff has failed to demonstrate they were improper, the undersigned recommends finding that the ALJ's credibility determination is supported by substantial evidence.

b.     RFC Determination

Plaintiff also asserts that the ALJ's RFC assessment was faulty. Plaintiff contends that the central problem with the RFC analysis is the ALJ's reliance on "evidence from

all over the record" to assess the state of Plaintiff's degenerative condition in 2004. [Entry #15 at 17]. A review of the ALJ's decision, however, reveals numerous references to records from 2004 that the ALJ relied on in determining Plaintiff's RFC. *See* Tr. at 735–39. Furthermore, in its prior order remanding this matter, the court acknowledged the undersigned's comment that the ALJ did not err in discussing medical evidence prior to the alleged onset date, but should not have primarily focused on opinions from 2001 in explaining why he rejected Dr. Castellone's opinions. *Martin*, 2011 WL 6115032, at *2. In the present decision, the ALJ cured the undersigned's concerns regarding reliance on opinions from 2001 by including additional references to records during the relevant time period to support his findings. For these reasons, the undersigned recommends finding that the ALJ properly assessed Plaintiff's RFC.[6]

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

---

[6] At the conclusion of his arguments regarding the ALJ's step four analysis, Plaintiff asserts that the ALJ (1) improperly substituted his own judgment for that of Plaintiff's treating physician in finding that Dr. Castellone's medical opinions were entitled to no weight, and (2) discarded most of the consultative examiner's findings and inexplicably focusing on the examiner's GAF score assessment. [Entry #15 at 20]. Because Plaintiff provided no argument or authority in support of these assertions, the undersigned recommends finding that they are waived. *See United States v. Flores*, 572 F.3d 1254, 1265 n.3 (11th Cir. 2009) (noting that bare allegations without citation of "any authority" or supporting facts are waived).

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

June 9, 2014                                        Shiva V. Hodges
Columbia, South Carolina                           United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).